UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL MATTHEW LAVENTURE,

    Plaintiff,

v.                                                 Case No. 1:07-cv-942
                                                 Hon. Gordon J. Quist

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for disability insurance benefits (DIB) and supplemental security income (SSI).

Plaintiff was born on July 25, 1975 and completed the 11th grade (AR 55, 79).[1] He also had some formal training in auto repair and auto mechanics (AR 412). Plaintiff initially alleged a disability onset date of April 18, 2000 (AR 55). Plaintiff amended the alleged onset date to September 10, 2000, after noting that he worked for Fleet Engineers, Inc. from May 2000 through July 2000 (AR 73). Plaintiff had previous employment as a general laborer and maintenance man (AR 75). Plaintiff identified his disabling conditions as follows: "Discs blown, add [Attention Deficit Disorder], anxiety disorder, emotionally impaired" (AR 74). Plaintiff stated that these conditions limit his ability to work because "[I] can't sit for more than 20 minutes without hurting,

---

[1] Citations to the administrative record will be referenced as (AR "page #").

can't lift things, lean over hood of car to work on them" (AR 74-75). After administrative denial of plaintiff's claim, an Administrative Law Judge (ALJ) reviewed plaintiff's claim *de novo* and entered a decision denying these claims on September 7, 2006 (AR 13-23). This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

## I. LEGAL STANDARD

This court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. §405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only. This Court does not review the evidence *de novo*, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence. *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §§ 404.1505 and 416.905; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.* If it is determined that a claimant is or is not

disabled at any point in the evaluation process, further review is not necessary. *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

The federal court's standard of review for SSI cases mirrors the standard applied in social security disability cases. *See Bailey v. Secretary of Health and Human Servs.*, No. 90-3265, 1991 WL 310 at * 3 (6th Cir. Jan. 3, 1991). "The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).

## II.  ALJ'S DECISION

Plaintiff's claim failed at the fifth step of the evaluation. Following the five steps, the ALJ initially found that plaintiff was insured for DIB through December 31, 2004, and that he has not engaged in substantial gainful activity since the amended onset date of September 10, 2000 (AR 15). Second, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine (status-post laminectomy and microdiscectomy at L4-L5), a dysthymic disorder, and a personality disorder, not otherwise specified (AR 15). At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (AR 16).

The ALJ decided at the fourth step that plaintiff had the residual functional capacity (RFC):

> to perform jobs that require that [sic] ability to understand, remember, and carry out only short, simple instructions, and that involve lifting and/or carrying up to twenty pounds occasionally and up to ten pounds frequently, occasional stooping, kneeling, crawling, and climbing of ramps and stairs, only occasional pushing or pulling with the lower extremities, and that further involve no frequent interaction with coworkers or the general public.

(AR 16). The ALJ found that plaintiff could not perform any of his past relevant work (AR 21).

At the fifth step, the ALJ determined that plaintiff could perform a range of light work in Michigan, including the following jobs: machine tender (8,800 jobs); light assembler (18,500 jobs); and line attendant (4,800 jobs) (AR 22). Accordingly, the ALJ determined that plaintiff was not under a disability and entered a decision denying benefits (AR 22).

### III. ANALYSIS

Plaintiff, proceeding pro se, did not submit a brief as required by the court's order directing filing of briefs. The court issued an order to show cause for lack of prosecution, to which plaintiff submitted a handwritten response. The court accepted plaintiff's response as his brief. The court gleaned three issues from plaintiff's brief:

1. The ALJ improperly found that plaintiff lacked credibility.
2. The ALJ should have followed Dr. Krencik's opinion that plaintiff was disabled.
3. Plaintiff suffers from memory loss due to Methadone.

**A.    Plaintiff's credibility**

Plaintiff testified that due to pain in both legs, low back and testicle, he can only sit for 20 to 30 minutes at a time, stand only about 15 minutes and walk about 3/4's of block (AR 419-21). After walking that distance, if his back is tight, then he relaxes in his Lazy Boy, puts a pillow and sometimes heat on his back, gets something to drink, takes his medications and watches television (AR 421). He uses a pillow every day for support (AR 421). He has to sleep with two pillows, otherwise his right leg will be numb when he wakes up (AR 421). Plaintiff testified that he can only sleep on his back with two pillows under his legs (AR 422). He takes the following medications: Methadone for pain; Xanax for an anxiety disorder/panic disorder; and Lexapro for

5

panic, depression and pain (AR 422-24).  He gets sleepy when he sits down to watch television, spending three to five hours a day lying down due to his back (AR 424).  Plaintiff's hobbies include building model cars and fishing on shore at his cabin on the Betsy River (AR 432-33).  He testified that he needs assistance with personal care, such as putting on shoes, socks and pants (AR 433).  He can wash dishes for only about five minutes (AR 434).  His daily activities include cutting the front lawn, which he described as "small" (AR 434).  On a bad day, which occurs a "couple days a week," plaintiff is hurting, his anxiety builds up, and he is stressed out (AR 434-35).  On those days, he just wants to sit down, relax, watch television and block things out (AR 434).  When the ALJ asked plaintiff if he could work for 40 hours per week as a security monitor, where he can sit in a chair, stand and stretch when he wanted,  make telephone calls if something looks suspicious and take some notes, plaintiff responded "absolutely not" (AR 435).

The ALJ set forth an extensive discussion regarding plaintiff's credibility, which will be reproduced in its entirety:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
>
> While the claimant has a history of back pain with objective findings on MRI studies, and is status-post lumbar laminectomy and microdiscectomy at L4-L5 performed in October 2003, he also has a history of not being very forthcoming about the level of his activity since his amended alleged onset date.  In determining whether the claimant is disabled secondary to his alleged disabling impairments, discrepancies between the claimant's objective medical records and the claimant's allegations and testimony raise questions about his credibility.  Here the claimant has alleged disability since September 2000 (amended alleged onset date) due primarily to back and leg pain, and emotional problems.  However, statements that he made to treating doctors, as reflected in his medical records bring his credibility into serious question.  On January 26, 2003 the claimant went to the emergency room at Mercy with complaints of back pain after he went sledding the night before that visit (Exhibit 6F).  On March 23, 2003 he told a doctor at Mercy that he was lifting a

6

heavy compressor when he had low back pain (Exhibit 8F). On May 10, 2003 he fell while working on his house and hurt his back (Exhibit 10F, p. 1). On August 4, 2003 the claimant bumped his chin while he was climbing a ladder, again while working on his house (Exhibit 11F, p. 1). He also told a physician at Hackley Hospital emergency department on September 28, 2003 that he had been racing a car the night before that visit and had spun out and was hit by another vehicle. As a result, he had a sore neck (not back pain) the following morning. He had taken no pain medication that day, despite the fact that he was allegedly taking pain medication for his back (Exhibit 12F). At the hearing, the claimant was baffled by what the doctor had written in his records on that visit, denying racing cars at any time relevant to this matter. However, it is extremely unlikely that the doctor recorded such an unusual note if that is not what the claimant had told him. In addition, people on average tend to be more forthcoming about the cause of their symptoms when they are being treated in a hospital, since they want treatment that will resolve their medical problems, which an accurate medical history assists. Those medical notes cited above only go to show that the claimant was capable of more strenuous activity than he claimed during that period of time up until his surgery of October 10, 2003; a period of time during which he claimed to be disabled (Exhibit 13F).

Even after his surgery the claimant was a no-show at physical therapy sessions that were scheduled for him. In fact, he failed to show up for three different scheduled appointments (Exhibit 7F). On June 18, 2004 Dr. Deitrick reported that the claimant could walk on heels and toes, walk, squat, climb stairs, and get on and off the examining table without difficulty. He also had a normal gait (Exhibit 25F, p. 8). The doctor also noted that the claimant continued to work in January 2004, contrary to the claimant's allegations (Exhibit 25F, p. 15). Other references to working can be found in 16F, p. 4; and 19F[ ]. Also crucial in the evaluation of the claimant's credibility is the fact that he demonstrated significant drug-seeking behavior that was noted by several doctors, as explained above. This is a significant observation since the claimant may have made complaints of symptoms that were exaggerated in order to have the doctors prescribe medication that was to support a drug habit or addiction, and not to treat legitimate symptoms of his diagnosed conditions.

(AR 19-20).

In addition, the ALJ made the following observations:

Since his alleged disability onset date he did work for Grand Haven Construction Company. He denied working for a leasing company, although that is contradicted by his earnings record (Exhibit 5D). Since 2000 he worked as a mechanic. He denied doing any maintenance work since 2000.

(AR 18).

Finally, the ALJ recounted plaintiff's medical history with respect to seeking out drugs after he underwent a left L4-L5 lumbar microdiscectomy on October 10, 2003:

> On December 2, 2003, the claimant went to Hackley Hospital complaining of back pain, and that he had run out of Norco, his pain medication. He told the doctor that he had gotten in an argument with his wife and dumped out the medication. However, the claimant's primary care doctor, Dr. Deitrick was called, and the doctor indicated that the claimant had recently been prescribed a large amount of that medication. The claimant's version of how he ran out of medication was found to be not credible, and he was prescribed no additional medication at that time (Exhibit 17F, p. 3). He returned to the Hackley ER on January 1, 2004 asking for more Norco and claiming to have run out again. He was given a shot of pain medication, but no Norco at that time (Exhibit 18F). He was back in the emergency department on March 5, 2004 pleading for a Norco prescription, which he claimed was waiting for him at his pharmacy. However, he could not provide the name of that pharmacy at the time. It was noted that the claimant had chronic low back pain, and the demonstrated "drug seeking" behavior (Exhibit 20F p. 2). On May 10, 2004 the claimant claimed that he left his Norco at his cottage and needed more, which Dr. Deitrick would not provide (Exhibit 25F, p. 11). On January 14, 2004 the doctor noted that the claimant was working (Exhibit 25F, p. 15).

(AR 17).

Since his disability onset date of September 10, 2000, the record reflects that plaintiff has worked and engaged a number of activities inconsistent with his alleged disabled condition: January 16, 2003 (plaintiff reported to his surgeon that "[h]e works as a mechanic now and he is having some difficulty changing tires, doing overhauls, etc."); January 26, 2003 (plaintiff reported to urgent care facility complaining of back pain while sledding; when asked if he was cleared to go sledding plaintiff answered "no"); March 23, 2003 (plaintiff reported to an urgent care facility complaining of back pain, stating that "he has been moving, and he has had to lift an office heavy compressor"); May 22, 2003 (plaintiff reported that he has had increased back pain since May 10, 2003, when he fell while working on his house); July 11, 2003 (plaintiff reported to emergency room stating that he had increasing back pain since falling while working on his house in May); July 11,

8

2003 (plaintiff told Dr. Deitrick "about having just built a new house and putting in a water heater and furnace and all that stuff in");  August 4, 2003 (plaintiff at hospital after injuring his jaw and teeth when he slipped off a stepladder); September 28, 2003 (plaintiff at emergency room complaining of neck injury suffered while driving his car in an auto race); November 25, 2003 (plaintiff reported to Joan Sullivan, PA-C that his pain is much better controlled and he is going hunting this weekend for small game);  January 14, 2004 (plaintiff reported to Dr. Deitrick that he was working); February 26, 2004 (plaintiff went to emergency room stating that he was outside of his vehicle, it started rolling, he tried to stop it with his foot, but the tire ran over his foot);  May 10, 2004 (plaintiff fell in the river near his cottage and "scratched himself up pretty good"); July 12, 2004 (plaintiff reported that he worked the first shift at Interior Concepts in Spring Lake, shared outdoor chores with his wife, does laundry, makes breakfast and lunch for the children, retires as 1 a.m., and stated following interests "I like to play with the kids, ride my bike, motorcycle, go to the beach and hang out with my family"  (AR 190, 196, 199, 202, 205, 222, 230, 234, 249, 300, 304, 308).

Finally, the court notes that in December 2005 plaintiff reported to Dr. Krencik that "[h]e does believe that there is some type of work that he can do, but he has not been able to find that" (AR 337).

An ALJ may discount a claimant's credibility where the ALJ "finds contradictions among the medical records, claimant's testimony, and other evidence." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).  The court "may not disturb" an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  *See Casey v. Secretary of Health and Human Servs.*,  987 F.2d 1230, 1234 (6th Cir.

9

1993) (an ALJ's credibility determinations are accorded deference and not lightly discarded). Substantial evidence supports the ALJ's credibility determination in this case. The ALJ found numerous discrepancies among the medical records, plaintiff's testimony, and other evidence sufficient to discount plaintiff's credibility. *See Walters*, 127 F.3d at 531. There is no compelling reason to disturb the ALJ's credibility determination. *See Smith*, 307 F.3d at 379. Accordingly, plaintiff's claim that the ALJ improperly evaluated his credibility should be denied.

### B.     Dr. Krencik's opinion

Next, plaintiff contends that the ALJ should have followed the opinion of David Krencik, D.O. Dr. Krencik, a physician at a pain management clinic, began treating plaintiff in November 2004 (AR 352-54). His treatment included medication management, low back exercises, hot packs and nerve root injections (AR 345-54). Dr. Krencik also recommended a narcotic agreement, apparently due to plaintiff's past misuse or abuse of medication (AR 351). By March 2005, plaintiff reported that his pain was under better control (down from 50% of what it had been), his activity level up and his Methadone was reduced with no complaints of side effects (AR 346). In May 2005, plaintiff reported to Dr. Krencik that his back pain increases "when chasing my kids around," that he sits on the couch watching television most days and cannot understand why he does not get disability (AR 344). Dr. Krencik noted "however, [plaintiff] has not been willing to participate in physical therapy" (AR 344). At that time, Dr. Krencik diagnosed plaintiff with chronic low back pain, radiculopathy and disability (AR 344).

In a statement dated October 6, 2005, Dr. Krencik stated that given his understanding of plaintiff's condition, plaintiff's symptoms of back and leg pain could be increased by sustained activity, such as prolonged walking, prolonged standing or prolonged sitting (AR 401). The doctor

agreed that, given his understanding of plaintiff's impairment, "during the course of a typical day" plaintiff may need to lie down for 1/2 hour in the morning and 1/2 hour in the afternoon to obtain some relief from back and leg pain (AR 402). Dr. Krencik felt that plaintiff was credible and "consistent throughout the exam" (AR 402). However, in December 2005, Dr. Krencik gave plaintiff information about a "career coach" to "hopefully getting him into some type of placement back into work" (AR 340).

The ALJ summarized Dr. Krencik's opinions as follows:

> On November 29, 2004 David M. Krencik, D.O., of Michigan Pain Consultants (Exhibit 28F, p. 2), saw the claimant who complained of radiating low back pain. At that time the claimant had positive straight leg raising. The doctor prescribed Methadone and Neurontin. On May 20, 2005 the doctor assessed the claimant as being disabled (Exhibit 26F, p. 11). The doctor diagnosed the claimant with post-lumbar laminectomy syndrome, chronic low back pain, lumbar radiculopathy, arachnoiditis, and degenerative disc disease, and administered injections to the claimant (Exhibit 26F, pp. 3, 4, 6). In a written statement provided by Dr. Krencik taken on October 26, 2005 the doctor indicated that the claimant's complaints of back pain and the need to lie down at least twice during the day were consistent with the doctor's objective findings. He also concluded that he saw nothing that made him question the claimant's credibility, and did not indicate in that statement that the claimant was disabled (Exhibit 28F).

(AR 17).

Ultimately, the ALJ adopted Dr. Deitrick's opinions regarding plaintiff's mobility, credibility and drug seeking behavior over Dr. Krencik's May 5, 2005 statement that plaintiff was disabled:

> The opinions of Dr. Deitrick, the claimant's primary treating doctor, concerning his impairments and limitations from those impairments are accompanied by objective medical findings and a clear medical rationale, and are consistent with other evidence of record. Accordingly, his opinions and findings are given great weight. However, the opinion of Dr. Krencik that the claimant was disabled are [sic] entitled to no weight. While he express that opinion in an office note (Exhibit 26F, p. 11), he did not repeat that conclusion in his statement (Exhibit 28F). In addition, Social Security Ruling 96-5p and 20 CFR § 404.1527(e) and § 416.927(e) provide

>that the ultimate determination of "disability" under the Social Security Act is reserved to the Social Security Commissioner and her delegees, and opinions by other persons on such issues are not entitled to controlling weight.

(AR 20).

Although Dr. Krencik was a treating physician, the ALJ was not bound by the doctor's conclusion that plaintiff was unable to work. *See* 20 C.F.R. § 404.1527(e)(1) ( "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that you are disabled"). Such statements, by even a treating physician, constitute a legal conclusion that is not binding on the Commissioner. *Crisp v. Secretary of Health and Human Servs.*, 790 F.2d. 450, 452 (6th Cir. 1986). The determination of disability is the prerogative of the Commissioner, not the treating physician. *See Houston v. Secretary of Health and Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984).

Furthermore, the ALJ could properly adopt Dr. Deitrick's opinions other those expressed by Dr. Krencik. It is the function of the Commissioner to resolve conflicts in the medical evidence. *See King v. Heckler*, 742 F.2d 968, 974 (6th Cir.1984). This function includes "the authority of the ALJ to resolve any conflicts among the opinions of treating and examining physicians." *Jenkins v. Chater*, 76 F.3d 231, 233 (6th Cir. 1996). An ALJ has good cause to reject the opinion of one treating physician where there were contrary opinions of other treating physicians supported by objective medical evidence. *Milam v. Bowen*, 782 F.2d 1284, 1287 (5th Cir. 1986). It is not the duty of the courts to resolve a conflict between a claimant's treating physicians. *Price v. Chater*, No. 96-6395, 1997 WL 219754 at *1 (6th Cir. April 30, 1997). Accordingly, plaintiff's claim that the ALJ failed to adopt Dr. Krencik's opinions should be denied.

### C. Plaintiff's memory loss due to Methadone

Finally, plaintiff asserts that he suffers memory loss due to his Methadone prescription. In November 2004, plaintiff reported to Dr. Krencik that the Methadone made him a "little sleepy," but "works very well" before it wears off after five or six hours (AR 352). When the ALJ asked plaintiff about side effects from medications, he responded as follows:

> Yes, I get, I get pretty sleepy when I sit down in a chair and get comfortable, you know, and I'll fall asleep watching TV a lot, you know. I spend a lot of time laying down. That's what I do, you know.

(AR 424).

Allegations of a medication's side effects must be supported by objective medical evidence. *Farhat v. Secretary of Health and Human Servs.*, No. 91-1925, 1992 WL 174540 at * 3 (6th Cir. July 24, 1992). *See Bentley v. Commisoner of Social Security*, No. 00-6403, 2001 WL 1450803 at *1 (6th Cir. Nov. 6, 2001) (noting absence of reports by treating physicians that claimant's "medication caused drowsiness as a side effect"); *Donegan v. Secretary of Health & Human Servs.*, No. 92-1632, 1993 WL 291301 at *7 (6th Cir. Aug. 2, 1993) (no objective medical evidence supported claimant's allegation that Tylenol 3 made him so drowsy he could not work); *Dodd v. Sullivan*, 963 F.2d 171, 172 (8th Cir. 1992) (no evidence in record that claimant told his doctors that the medication made him drowsy); *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990) (noting that the record did not disclose concerns about side effects by the several doctors who examined and treated claimant). Plaintiff presents no evidence that he suffers from disabling side effects from Methadone or any other medication. This claim should be denied.

**IV.     Recommendation**

      I respectfully recommend that the Commissioner's decision be affirmed.


Dated:  December 23, 2008                      /s/ Hugh W. Brenneman, Jr.
                                                  HUGH W. BRENNEMAN, JR.
                                                  United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).